**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARTIN E. MORGAN, JR.,                    *

Plaintiff,                    *

v.                    *                    Civil Action No. ELH-22-2982

DR. YONAS SISAY,                    *

Defendant.                    *
                    ***

**<u>MEMORANDUM OPINION</u>**

The self-represented plaintiff, Martin E. Morgan, Jr., who is presently incarcerated at the Maryland Correctional Institution in Jessup, Maryland ("MCIJ"), filed suit pursuant to 42 U.S.C. § 1983 against Dr. Yonas Sisay, a medical doctor at MCIJ.  ECF 1.  In his Complaint, Morgan alleges that he has not received proper medical care at MCIJ, and that Dr. Sisay has been deliberately indifferent to his medical needs.  *Id.* at 2-3.[1]  He seeks $100,000 in damages, good conduct credit that he "would receive for working a job in prison", but for his untreated health condition, as well as injunctive relief.  *Id.* at 3.

Dr. Sisay moved to dismiss for failure to state a claim or, alternatively, for summary judgment.  ECF 10.  His motion is supported by a memorandum of law (ECF 10-1) (collectively, the "Motion"), as well as numerous exhibits, including an affidavit and Morgan's extensive and voluminous medical records.  Morgan opposes the Motion.  ECF 12.  Dr. Sisay replied.  ECF 13.

The matter is now ripe for disposition.  Upon review of the record, exhibits, and applicable law, the court deems a hearing unnecessary.  *See* Local Rule 105.6 (D. Md. 2021).  I shall construe Dr. Sisay's Motion as one for summary judgment and grant it.

---

[1] All citations reflect their electronic pagination.

## I.      Factual Background

Plaintiff was transferred to MCIJ on July 8, 2020.  ECF 10-3 (Dr. Sisay Decl.), ¶ 26.  Dr. Sisay, a medical doctor at MCIJ, recounts that Morgan has a medical history that includes a gunshot wound to the back and abdomen in 2007.  *Id.* ¶ 11 (citing Med. Records, ECF 10-5 at 9).  At that time, Morgan had surgery to remove part of his intestine, and he has reported blood in his stool since 2008.  *Id.*  As Dr. Sisay puts it, plaintiff "has a complicated medical history . . . ." *Id.* ¶ 5.

Morgan alleges that he has suffered from rectal bleeding, necessitating blood transfusions over the past year.  ECF 1 at 2.  When he asked to be sent to a hospital for further evaluation of his condition, he claims that Dr. Sisay "stated no and that wasn't going to happen." *Id.*  Instead, Dr. Sisay directed Morgan to continue taking iron supplements to reduce the need for blood transfusions.  *Id.*  Morgan claims that on November 2, 2022, he submitted an administrative grievance regarding Dr. Sisay's refusal to provide proper medical care.  Morgan fears that his continued blood loss may lead to heart failure or death.  *Id.*

Prior to plaintiff's transfer to MCIJ on July 8, 2020, Morgan received treatment for his rectal bleeding and iron deficiency anemia from other medical providers at several Division of Correction institutions.  *See generally* Med. Records, ECF 10-4 at 391-445; ECF 10-5 at 4-94.  For example, Morgan saw a provider at Central Maryland Correctional Facility ("CMCF") on May 8, 2020.  ECF 10-5 at 74-75.  At that time, Morgan's hemoglobin was critically low, and he was admitted to the University of Maryland Medical Center ("UMMC") on an emergency basis.  *Id.* at 78.  While at the hospital, a rectal exam was performed, leading to the conclusion that he had anemia secondary to likely hemorrhoids.  *Id.* at 85.  A CT of the abdomen and pelvis showed no bowel obstruction, inflammation, or diverticulitis.  *Id.*  In addition, an

esophagogastroduodenoscopy ("EGD") showed a normal esophagus and duodenum, and a colonoscopy showed a normal colon with no blood. *Id.* The gastroenterologist assessed microcytic anemia likely secondary to hemorrhoids and recommended intravenous ("IV") iron as an outpatient, if possible; iron supplements every other day with Vitamin C; and continuing MiraLAX, Colace, and Senna daily to avoid constipation. *Id.*

The gastroenterologist remained concerned about anastomosis as the source of bleeding. *Id.* at 92. The anastomosis site is the section in the intestine where the portions of the bowels were surgically reconnected during Morgan's bowel surgery in 2007. ECF 10-3 at ¶ 17. Therefore, a capsule colon exam for the small bowel was recommended. ECF 10-5 at 92. Because Morgan was noted to have excessive ibuprofen use, he was advised to avoid ASA and NSAIDs. *Id.* at 93. The provider at CMCF ordered a complete blood count and planned to submit a consult for hemorrhoid surgery after receiving the results. *Id.*

Dr. Sisay saw Morgan for the first time on July 24, 2020, at MCIJ. ECF 10-3 at ¶ 26; ECF 10-5 at 129-31. Dr. Sisay noted Morgan's medical history, renewed his medications, and planned to review the EGD, colonoscopy reports, and discharge papers to determine whether follow-up with a specialist was needed. ECF 10-5 at 129-31. Five days later, Morgan was sent to the Baltimore Washington Medical Center ("BWMC") for rectal bleeding with dizziness and shortness of breath. *Id.* at 138. At that time, he was diagnosed with a gastrointestinal hemorrhage, although a CT of the abdomen/pelvis showed no acute intra-abdominal process. ECF 10-4 at 112-28.

Dr. Sisay saw Morgan again on August 12, 2020, during which time he prescribed iron elixir with promethazine and increased acetaminophen to 500 mg daily as needed. ECF 10-5 at 146-48. Dr. Sisay also ordered labs and submitted a consultation request for a surgeon at UMMC. *Id.* at 148. On August 21, 2020, Dr. Sisay noted that the request was not approved. *Id.* at 149.

According to the Utilization Management ("UM") reviewer, the gastroenterologist had already recommended treatment plans, which the reviewer recommended following.  *Id.*  Dr. Sisay appealed the denial of a surgical consult.  *Id.*

On September 9, 2020, Dr. Sisay saw Morgan to check his compliance with iron therapy. *Id.* at 154.  Morgan reported continued rectal bleeds and compliance with iron in five or six days out of seven.  *Id.*  His dizziness and tiredness were improved, and he reported he felt well.  *Id.*  Dr. Sisay ordered additional labs and planned a follow-up appointment to discuss the results.  *Id.* at 155.  Two days later, Dr. Sisay submitted a consult request for UMMC Gastroenterology for definitive therapy.  *Id.* at 159-62.  On October 8, 2020, Dr. Sisay noted that the request was not approved.  *Id.* at 163-65.  On that day, he ordered Desitin paste, Witch hazel wipes, lidocaine gel 5%, Senna, ascorbic acid, and ferrous sulfate.  *Id.* at 165.

Dr. Sisay submitted another consultation request on January 20, 2021, for Morgan to be seen at UMMC Surgery.  *Id.* at 214.  On March 11, 2021, he noted that the request was not approved, and that the UM reviewer was considering a rectal examination with guaiac and verification of compliance with iron supplementation.  *Id.* at 223.  Morgan reported he had not taken iron in about four weeks because it made him nauseous and that he suffered from intermittent rectal bleeds.  *Id.*  Dr. Sisay ordered a complete blood count, stool guaiac, and renewed Morgan's medications.  *Id.* at 223-25.

Morgan was sent to the BWMC emergency room on March 25, 2021, due to a low hemoglobin count.  ECF 10-4 at 6.  He was subsequently admitted to BWMC with principal problems of rectal bleeding and active problems of iron deficiency anemia, anxiety, and depression.  *Id.*  Morgan underwent an EGD and colonoscopy and was found to have mild gastritis as well as inflamed internal hemorrhoids, but otherwise normal EGD.  *Id.*  There was also normal

colonic and terminal ileal mucosa with inflamed internal hemorrhoids. *Id.* The gastroenterologist noted that the severity of anemia could not be explained by a hemorrhoidal bleed, and he recommended a capsule endoscopy and hematology evaluation. *Id.* Morgan was discharged on March 27, 2021. *Id.*

On March 29, 2021, Dr. Sisay reviewed the discharge records and submitted a consultation request for a capsule endoscopy per the recommendation. ECF 10-5 at 183-90, 235-36. On June 8, 2021, he submitted a consult request for Hematology. *Id.* On June 16, 2021, Dr. Sisay noted that the Hematology consultation was not approved. *Id.* at 276. The UM reviewer explained that Morgan's anemia was likely due to gastrointestinal blood loss, and therefore capsule endoscopy results needed to be reviewed before determining next steps and management. *Id.*

Morgan saw gastroenterologist Dr. Eric Goldberg on June 17, 2021, for a wireless capsule endoscopy of the small intestine. ECF 10-4 at 159. By the end of the study, the capsule appeared to reach the ileum but not the cecum. *Id.* at 162. The study showed a normal stomach, duodenum, jejunum, and incidental finding of nodular lymphoid hyperplasia of the ileum. *Id.* No source of blood loss was seen on this capsule. *Id.* at 163. However, the portions of the distal small bowel were not seen as the study appeared to have been terminated early. *Id.* On August 25, 2021, Dr. Sisay submitted a consultation request for a post capsule endoscopy gastrointestinal evaluation. ECF 10-5 at 295.

Dr. Kiran Motwani, an internal medicine specialist, saw plaintiff on November 10, 2021, regarding the capsule study, which was incomplete and did not reveal a source of bleeding. ECF 10-4 at 136-38. Given prior records, Dr. Motwani suspected that the hematochezia was due to hemorrhoidal bleed and with ongoing iron deficiency anemia vs. small bowel source. *Id.* at 138. He wanted to check celiac serologies and recommended a repeat video capsule endoscopy and a

bowel regimen with daily soluble fiber supplementation and MiraLAX to prevent constipation. *Id.* Dr. Motwani also recommended Preparation H and witch hazel wipes for rectal discomfort and IV iron since Plaintiff was unable to tolerate oral iron supplements. *Id.* As a result, on November 11, 2021, Dr. Sisay ordered witch hazel, MiraLAX, and labs, and submitted consultation requests for a repeat video capsule endoscopy and for Hematology. ECF 10-5 at 303-05.

On November 17, 2021, Morgan was admitted to the Jessup Regional Infirmary ("JRI") for monitoring overnight after reporting dizziness. ECF 10-4 at 145. The physician's assistant on duty spoke with Dr. Sisay, who agreed to see Morgan and order a complete blood count. ECF 10-5 at 324-35. It was noted that Morgan's anemia was likely secondary to iron malabsorption (and/or anastomotic ulcers) from the prior small bowel resection. *Id.*

Dr. Sisay saw Morgan on November 19, 2021, and sent him to the BWMC emergency room after finding that he had a low hemoglobin level. *Id.* at 328-30. Morgan was transfused with one unit of blood, raising his hemoglobin level from 6.5 to 8.1. ECF 10-4 at 125-35. A colonoscopy performed on November 22, 2021, revealed blackish tinged liquid and stool throughout the colon, but no active bleeding source. ECF 10-5 at 334. The gastroenterologist recommended an EGD. *Id.* On November 24, 2021, plaintiff was discharged and returned to JRI and then MCIJ. *Id.* at 338-40.

On December 1, 2021, Morgan refused to be COVID-screened and refused to go to his Hematology appointment. *Id.* at 347. On December 22, 2021, he said he was not feeling well and refused to attend his appointment for the repeat video capsule endoscopy at UMMC. *Id.* at 353. On January 27, 2022, Dr. Sisay saw Morgan, ordered labs, and sent emails to reschedule the missed appointments. *Id.* at 611.

Dr. Ravi Krishnan, a hematologist, saw Morgan on February 24, 2022, via telemedicine, for evaluation and care of iron deficiency anemia. ECF 10-4 at 217. Because Morgan was intolerant of oral iron formulations due to severe side effects, Dr. Krishnan planned IV iron to avoid blood transfusions. *Id.* at 219. Dr. Sisay submitted a consultation request for Hematology after Dr. Krishnan had recommended an IV iron infusion. ECF 10-5 at 584-85.

On March 2, 2022, Morgan saw Dr. Krishnan for an IV iron infusion. ECF 10-4 at 214. On the following day, Dr. Sisay discontinued iron elixir because Morgan was not taking it and had started IV iron therapy. ECF 10-5 at 581. Morgan again saw Dr. Krishnan on April 6, 2022, for a second IV iron infusion. ECF 10-4 at 212. Dr. Krishnan recommended placement of a mid-line or PICC line for any future IV iron due to difficulties with the infusion. *Id.*

Morgan had a second capsule endoscopy on April 13, 2022, performed by gastroenterologist Dr. Mian Khalid. *Id.* at 190-95. At that time, Morgan reported continued blood mixed in with his stools, with no abdominal pain. *Id.* Dr. Khalid placed a second capsule to obtain more information on the etiology of Morgan's obscure gastrointestinal bleeding. *Id.*

On May 23, 2022, Dr. Sisay placed a consultation request for PICC line placement for IV iron infusion. ECF 10-5 at 525. Dr. Sisay saw Morgan again on May 24, 2022, after a case conference was held in the presence of the administration. *Id.* at 522. Per UMMC, the capsule endoscopy result could not be downloaded and may have to be repeated. *Id.* Per Hematology, Morgan needed a midline or PICC line for continued IV iron, as it was likely that he would require periodic IV iron infusions pending diagnosis and definitive therapy. *Id.* After a thorough discussion, Morgan reported that he would rather retry the iron elixir than proceed with the PICC line placement. *Id.* He also reported epigastric pain after eating and requested antacid. *Id.* Dr. Sisay ordered iron elixir, Prilosec, a complete blood count, and iron studies, and he directed

Morgan to return to the clinic if new symptoms developed, as well as to follow up in two weeks. *Id.* at 522-23.

Dr. Sisay saw Morgan on June 1, 2022, for chronic care. *Id.* at 519-20. Morgan had restarted iron elixir a week prior and reported full compliance except for that day but continued to bleed. *Id.* Dr. Sisay submitted a consultation request for a repeat capsule endoscopy, which was approved. *Id.* at 519-21. Morgan again saw Dr. Sisay on June 3 and June 8, 2022, to discuss lab results. *Id.* at 512-15. Morgan requested nausea medication to help him take the iron elixir, and Dr. Sisay ordered Phenergan and continued the oral iron elixir, noting that Morgan's hemoglobin levels were slightly improved. *Id.*

On August 4, 2022, Dr. Sisay ordered another complete blood count, food and medication delivery to Morgan's cell for one week, a bottom bunk for one year, and follow-up in one month. *Id.* at 503-05. Dr. Sisay next saw Morgan on September 14, 2022. *Id.* at 485. At that time, Morgan reported only partial compliance with iron elixir. *Id.* He had been scheduled for the repeat capsule endoscopy on August 24, 2022, but was told he was not in the computer and would need to be rescheduled. *Id.* Dr. Sisay renewed plaintiff's medications, ordered a complete blood count, and requested to reschedule the repeat capsule endoscopy. *Id.* at 485-88.

On November 18, 2022, the Regional Medical Director ordered Morgan to be sent to the emergency room via 911 for critical lab values and his complaints of chest pain/tightness and dizziness. *Id.* at 469. Morgan was admitted to White Oak Medical Center ("White Oak"), where the attending physician, Dr. Emmanuel Kokotakis, diagnosed: (1) blood loss anemia; (2) abdominal pain; (3) GI bleeding; (4) hemorrhoid; (5) chronic kidney disease ("CKD") stage 3; and (6) upper GI bleed. ECF 10-4 at 333-36.

On November 21, 2021, Morgan had a colonoscopy with polypectomy.  ECF 10-5 at 369-70.  The findings in the colon were: (1) anal mass versus inflamed internal hemorrhoid; (2) rectal polyp; and (3) normal mucosa at anastomotic site.  *Id.*  Dr. Kokotakis recommended a surgery consult for evaluation of possible anal mass versus inflamed internal hemorrhoid.  *Id.*

On November 22, 2022, while still at White Oak, Morgan had a surgical consultation with Dr. Sherif Selim due to the prior colonoscopy result of questionable internal hemorrhoid versus anal mass.  *Id.* at 371-74.  There was no evidence of a prolapsed hemorrhoid and no palpable masses on a digital rectal exam ("DRE").  *Id.*  Dr. Selim saw no evidence of an anal mass that could be causing a lower gastrointestinal bleed but stated that it was difficult to assess this with a DRE and usually a colonoscopy is the definite measure to evaluate and obtain a biopsy.  *Id.*  Dr. Selim recommended considering a repeat colonoscopy in the next few weeks.  *Id.*

Morgan was discharged from White Oak on November 23, 2022, with a recommendation for a prescription of Anusol, a repeat colonoscopy, and a follow-up appointment.  *Id.* at 376-79.  Morgan's hemoglobin levels were much improved after a transfusion, and he was medically stable for discharge back to the correctional facility.  *Id.*  Morgan was returned to JRI.  ECF 10-4 at 361.

On November 28, 2022, the physician's assistant at JRI noted Morgan's discharge instructions before returning him to MCIJ.  ECF 10-5 at 398-400.  On November 29, 2022, Dr. Sisay reviewed the records from White Oak and submitted consultation requests for a gastroenterology follow-up at UMMC, PICC line placement for IV infusion, a follow-up at UMMC Hematology, and repeat second capsule endoscopy at UMMC.  *Id.* at 380-85.

Morgan saw Dr. Sisay on December 2, 2022, for chronic care.  He informed plaintiff that the repeat capsule endoscopy was scheduled for April 2023 and his surgery consult was listed as an alternative treatment plan pending the gastroenterology follow-up.  *Id.* at 361-64.  With regard

to Morgan's CKD diagnosis, Dr. Sisay advised plaintiff that labs would be repeated to reassess the reports. *Id.* at 361. During that visit, Morgan stated that the iron elixir was "nasty," and he wanted to have long term IV access for iron infusion but would try to take the iron elixir on and off in the meantime. *Id.*

In sum, Dr. Sisay's treatment plan included: (1) obtaining the CT abdomen/pelvis with IV report from White Oak; (2) contacting the hematologist for long term IV access; (3) renewing Morgan's medications; (4) providing a daily shower order; (5) ordering blood pressure checks daily for three days; and (6) following up one day after the gastroenterology evaluation. *Id.*

On December 9, 2022, Dr. Sisay submitted a consultation request for Port a Cath placement. *Id.* at 355. On December 13, 2022, Dr. Sisay noted that the consultation was not approved, and he appealed. *Id.* at 354. Dr. Sisay states that at the time he filed his Motion, Morgan was scheduled for PICC line placement for IV iron and further administration of IV iron. ECF 10-3 at ¶ 77.

## II.    Standards of Review

### A.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." *See*

*Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317-18 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of*

*the complaint.*'"   *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

Because Morgan is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord. Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013).  But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"   *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## B.

Dr. Sisay's Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).  But, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams*

*Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x 220, 222 (4th Cir. 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *Kolon Indus., Inc.*, 637 F.3d 435 at 448-49; *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.   Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).   "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"   *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom*; *Gardner v. Ally Fin., Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam).   A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"   *Harrods,* 302 F.3d at 244 (citations omitted).   But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.   And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Morgan has not filed an affidavit under Rule 56(d).  Moreover, I am satisfied that it is appropriate to address Dr. Sisay's Motion as one for summary judgment, as this will facilitate resolution of the case.

## C.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp.*, 477 U.S. at 322-24; *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

The Supreme Court has clarified that, under Rule 56(a), not every factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, to avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986); *see also Gordon*, 890 F.3d at 470.

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

But, summary judgment is appropriate if the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). In other words, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 525 (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). Indeed, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another,

or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).

Notably, the court must view the evidence in the light most favorable to the nonmovant, and draw all reasonable inferences in his favor, "without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002); *see Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). Nevertheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Of import, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Kellen v. Lott*, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because

it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc.*, 954 F.3d at 658-59 (citation omitted).   In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *accord Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to a material fact.  *Matsushita Elec.*, 475 U.S. at 585-86.  "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."  *Harmoosh*, 848 F.3d at 238.

Because Morgan is self-represented, his submissions are liberally construed.  *See Erickson*, 551 U.S. at 94; *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord. Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013).  But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt*, 999 F.2d at 778-79 and citing *Celotex Corp.*, 477 U.S. at 323-24).

### III.    Discussion

In his Motion, Dr. Sisay contends that Morgan fails to state a valid claim and, alternatively, Dr. Sisay is entitled to summary judgment because he was not deliberately indifferent to Morgan's medical needs.  ECF 10-1.

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King,* 825 F.3d at 218. Notably, it "proscribes more than physically barbarous punishments."  *Estelle*, 429 U.S. at 103.  It also "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . .'"  *Id.* (citation omitted).  Thus, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned."  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 989 U.S. 189, 199-200 (1989) (stating that when a state holds a person "against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"); *John Doe 4 v. Shenandoah Valley Juvenile Center Comm'n*, 985 F.3d 327, 338-39 (4th Cir. 2021).

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'"  *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.

Here, Morgan faults Dr. Sisay for failing to provide proper medical care.  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F. 3d 225, 241 (4th Cir. 2008).  The Fourth Circuit has characterized the applicable standard as an "exacting" one.  *Lightsey*, 775 F.3d at 178.  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available.  *See Farmer*, 511 U.S. at 837; *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  Proof of an objectively serious medical condition, however, does not end the inquiry.  As the Court explained in *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017), "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."

In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind."  *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate

21

health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Similarly, the Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001) ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted).  Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical

malpractice will not rise to the level of deliberate indifference." *Id.*; *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."). Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106). Further, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk

was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.

But, an inmate's mere disagreement with a medical provider as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012).

In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct. 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Morgan claims that Dr. Sisay was deliberately indifferent to his serious medical needs on November 2, 2022, when he refused to send Morgan to a hospital for further evaluation of his condition and instead directed Morgan to continue taking iron supplements.  ECF 1 at 2-3.  Although it is clear that Morgan suffers from a serious medical need and thus satisfies the objective prong, he fails to meet the subjective component.  In particular, Morgan has not shown that Dr. Sisay acted with reckless disregard in treating Morgan's medical condition.

After Morgan was transferred to MCIJ in July 2020, Dr. Sisay routinely saw him and advocated for his treatment.  As early as August 2020, Dr. Sisay requested a surgical consult on Morgan's behalf and, upon the UM reviewer's denial of that request, promptly appealed the decision.  ECF 10-5 at 148-49.  A month later, Dr. Sisay also submitted a request for a gastroenterology consultation.  *Id.* at 159-62.  When Dr. Sisay's second request for a surgical consult was denied in January 2021, he implemented the treatment plan that was recommended by the UM reviewer.  *Id.* at 223-25.

Morgan continued to be evaluated by specialists outside MCIJ.  And, Dr. Sisay followed their recommendations.  In March 2021, Dr. Sisay submitted requests for capsule endoscopy and a hematology consult, and in August 2021 he requested a gastroenterology evaluation.  *Id.* at 183-90, 235-36.  When Morgan missed appointments, Dr. Sisay ensured that they were rescheduled.  *Id.* at 611.

In 2022, Dr. Sisay monitored Morgan's condition on a monthly basis and implemented the treatment plan proposed by specialists.  *Id.* at 485, 503, 519-25, 581-85.  Following evaluations by gastroenterology, hematology, and surgery, it was determined that a capsule endoscopy was recommended with surgery as an alternative treatment plan.  *Id.* at 361-64.  In the meantime, because Morgan expressed a preference for long term IV access for iron infusion, Dr. Sisay placed

a request for Port a Cath placement.  *Id.* at 355, 361.  When the request was denied, Dr. Sisay appealed the decision.  *Id.* at 354.  In other words, he was an advocate for his patient, in a medical system in which certain medical decisions are not made by him.

On this record, Dr. Sisay's actions do not amount to deliberate indifference to a serious medical need.[2]  Although Morgan suffered from a serious condition, Dr. Sisay was diligent in attempting to ensure that needed care was available.  Therefore, his Motion, construed as a motion for summary judgment, shall be granted.

## IV.    Conclusion

Over the years, this Court has reviewed many prisoner cases alleging inadequate medical care.  In some instances, the medical care has, indeed, appeared less than optimal.  This case is not one of them.

There is no basis for a claim of constitutionally inadequate medical care.  The records reflect that, over a considerable period, plaintiff "has had numerous diagnostic tests, hospital admissions, laboratory tests and other care to determine the cause of his internal bleeding."  ECF 10-3, ¶ 5.  There is no evidence that Dr. Sisay ignored plaintiff's medical problems.  And, as Dr. Sisay observes, "even the outside specialists have been unable to make a conclusive determination . . . ."  *Id.*

In my view, there are no genuine disputes of material fact and Dr. Sisay is entitled to summary judgment as a matter of law.  Thus, Dr. Sisay's Motion, construed as one for summary judgment, shall be granted.

---

[2] To the extent that Morgan's Complaint raises state law claims of medical malpractice and negligence, the court declines to exercise supplemental jurisdiction.  Such claims will be dismissed, without prejudice.  *See* 28 U.S.C. § 1367(c)(3).  Plaintiff may pursue such claims in a state court, in accordance with applicable rules and procedures under the Maryland Health Care Malpractice Claims Statute.

A separate Order follows.


 May 17, 2023                                              /s/                         
Date                                              Ellen L. Hollander
                                                  United States District Judge